**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

MOBILE SHELTER SYSTEMS USA, INC.,

        Plaintiff,

vs.                                             Case No. 3:10-cv-978-J-37JBT

GRATE PALLET SOLUTIONS, LLC, and
THOMAS R. BUCK,

        Defendants.

_____

**ORDER**

This matter is before the Court on the following:

1.    Defendants' Motion for Partial Summary Final Judgment on Plaintiff's Patent Infringement Claim (Doc. No. 74), filed October 6, 2011;

2.    Defendants' Motion in Limine to Exclude Expert Testimony of Charles Benedict (Doc. No. 81), filed October 14, 2011;

3.    Plaintiff's Motion for Partial Summary Judgment (Doc. No. 82), filed October 14, 2011;

4.    Defendants' Motion for Summary Final Judgment (Doc. No. 83), filed October 14, 2011;

5.    Defendants' Notice of Filing Exhibits in Support of Defendants' Motion for Summary Final Judgment (Doc. No. 84), filed October 14, 2011;

6.    Defendants' Second Notice of Filing Exhibits in Support of Defendants' Motion for Summary Final Judgment (Doc. No. 85), filed October 14, 2011;

7.    Defendants' Notice of Refiling Exhibits A and L in Support of Defendants' Motion for Summary Final Judgment (Doc. No. 86), filed October 17, 2011;

8.     Defendants' Notice of Re-submission of Exhibit "5" to Motion in Limine to Exclude Expert Testimony of Charles Benedict (Doc. No. 87), filed October 17, 2011;

9.     Plaintiff's Response to Defendants' Motion for Partial Summary Judgment on Plaintiff's Patent Infringement Claim (Doc. No. 88), filed October 20, 2011;

10.    Defendants' Response to Plaintiff's Motion for Partial Summary Judgment (Doc. No. 91), filed October 27, 2011;

11.    Plaintiff's Response to Defendants' Motion in Limine to Exclude Expert Testimony of Charles Benedict (Doc. No. 93), filed October 28, 2011;

12.    Plaintiff's Motion to Strike Defendants' Summary Final Judgment Evidence (Doc. No. 94), filed October 28, 2011;

13.    Plaintiff's Response to Defendants' Motion for Summary Final Judgment (Doc. No. 95), filed October 28, 2011;

14.    Order to Show Cause (Doc. No. 97), issued November 1, 2011;

15.    Defendants' Notice of Filing Document Under Seal (Doc. No. 98), filed November 2, 2011;

16.    Defendants' Memorandum in Opposition to Plaintiff's Motion to Strike Defendants' Summary Final Judgment Evidence (Doc. No. 99), filed November 10, 2011; and

17.    Plaintiff's Response to the Court's November 1, 2011 Order to Show Cause (Doc. No. 101), filed November 10, 2011.

## I.  BACKGROUND

The parties to this lawsuit manufacture shipping and storage systems for use by the U.S. military. The only purchaser of Plaintiff's and Defendants' systems is the U.S. military. These purchases are made in accordance with a complicated contracting scheme known as the Federal Acquisition Regulation ("FAR") and the Defense Federal Acquisition Regulation Supplement ("DFARS"). In the most simplistic form, the purchasing process begins when the government agency, in this case the Defense Logistics Agency ("DLA"), responsible for procuring an item receives a request from one of its customers, which in this case were the U.S. Army and the U.S. Marine Corps. DLA then drafts a solicitation and advertises it on an internet website known as the DLA Internet Bid Board System ("DIBBS"). Potential bidders use DIBBS to review advertised solicitations and requests, and also to submit quotes and bids. DLA then evaluates the submitted quotes or bids and may enter into a contract based upon the submissions.

In 2006, DLA advertised a solicitation for metal shipping and storage containers. (Doc. No. 84-4, November 8, 2010 Affidavit of Thomas R. Buck (hereinafter "Buck Aff."), at ¶ 6; Doc. No. 85-1, September 28, 2011 Deposition of Joseph McHenry (hereinafter "McHenry Dep."), at 98:20-23.) In connection with the solicitation, the U.S. Marines held a pre-proposal conference at which interested businesses could seek information regarding the solicitation in Jacksonville, Florida. (Buck Aff., ¶ 7.) Defendant Thomas R. Buck attended the conference. (*Id.*) In response to the solicitation, Buck started operating Defendant Grate Pallet Solutions, LLC ("GPS"), a Florida Limited Liability Company which had, until this time, been inactive. (*Id.*) GPS submitted a single storage system designed to store vehicles to the Marines for testing in connection with the 2006 solicitation. (*Id.* at ¶ 8.) The testing was successful, and GPS was ultimately awarded two contracts to supply

3

such systems.  (Buck Aff., ¶¶ 8, 11.)  A third company, which is not a party to this lawsuit, was awarded a contract to supply the majority of the storage systems purchased as the result of the 2006 solicitation.  (*Id.* ¶ 10.)  Plaintiff was aware GPS was in contact with DLA regarding the 2006 solicitation, and even discussed a potential joint bid with GPS to produce the products requested.  (*Id.* ¶ 14.)

Four years later, in 2010, DLA advertised another solicitation for the U.S. Army for metal shipping and storage containers.  (*Id.* ¶ 19.)  The 2010 solicitation, however, identified the shipping and storage systems manufactured by Plaintiff Mobile Shelter Systems USA, Inc. as the items that the government sought to purchase.  (McHenry Dep. 50:10-14.) The solicitation also indicated that DLA would accept offers from manufacturers other than Plaintiff if such offers were accompanied by sufficient information for DLA to determine the products were acceptable alternatives to Plaintiff's products.  (*Id.* at 49:4 to 50:19.)

GPS prepared a response to DLA's 2010 solicitation, which is referred to as a protest,[1] and offered to fill the request by producing alternative products.  (*Id.* ¶ 19.)  DLA

---

[1]  Under FAR, a protest is a written objection by an interested party to any of the following:

    (1)     A solicitation or other request by an agency for offers for a contract for the procurement of property or services;

    (2)     The cancellation of the solicitation or other request;

    (3)     An award or proposed award of the contract; or

    (4)     A termination or cancellation of an award of the contract, if the written objection contains an allegation that the termination or cancellation is based in whole or in part on improprieties concerning the award of the contract.

*See* FAR 33.101.  It is clear, in this case, that GPS's protest fell within the first category, because it was in response to the solicitation's instruction to potential bidders to submit technical information for the potential bidder's products.  In other words, the protest was the vehicle by which GPS demonstrated to DLA that it could manufacture the items sought in the solicitation. (McHenry Dep. 69:10 to 71:1.)  There is no evidence of record that DLA proposed to award a contract to Plaintiff in response to the solicitation and, further, no

evaluated GPS's protest and determined that GPS's proposed storage systems were acceptable alternative products to Plaintiff's products.  (McHenry Dep. 68:15 to 69:24.)  DLA then issued an amended solicitation which, among other things, noted that GPS's products were acceptable alternatives to Plaintiff's products.  (*Id.*)  Although quotes were submitted in response to the amended solicitation, DLA has not awarded any contracts in connection with it.  (*Id.* 66:7-24.)

Plaintiff responded to GPS's protest by bringing this lawsuit and moving for a temporary restraining order ("TRO") to enjoin Defendants from bidding on any government solicitations issued by the military.  (Doc. Nos. 1,2, 7, and 8.)  In its Complaint, Plaintiff asserted fraud, trade dress infringement, tortious interference, and breach of contract claims against Defendants.  (Doc. No. 1.)  The Court declined to grant Plaintiff's TRO request and ultimately denied Plaintiff's Motion for a Preliminary Injunction.  (Doc. Nos. 11, 27.)  At the hearing on the motion for a TRO, and in its supporting briefs, Plaintiff attempted to buttress its request by referencing its intent to bring a patent infringement claim against Defendants.  The Court found such arguments unpersuasive as Plaintiff had not yet asserted a patent infringement claim against Defendants.  (Doc. No. 11, p. 7.)

The Court issued a Case Management and Scheduling Order on January 4, 2011.  (Doc. No. 32.)  Among other things, the order set June 10, 2011, as the deadline to amend the pleadings; June 30, 2011 as the deadline for the disclosure of expert reports; and September 9, 2011, as the deadline for all discovery.  (*Id.*)  After the case was assigned to the undersigned District Judge, the scheduling order was amended.  (Doc. No. 38.)  The

_____

evidence that the protest was requesting that DLA terminate an existing contract between DLA and Plaintiff.

discovery deadlines were not changed in the amended scheduling order.  (*Id.*)  Rather, the Court reset the trial term, adjusted the date of the pretrial conference, and modified the deadlines for mediation and for the filing of *Daubert* and dispositive motions.  (*Id.*)

The Magistrate Judge extended the deadline to amend the pleadings on June 2, 2011, in response to briefing on a discovery issue in which Plaintiff acknowledged that it failed to plead a claim for trade dress infringement with the proper clarity.  (Doc. No. 40, citing Doc. No. 36, p. 3 n.1.)  Plaintiff thereafter moved to amend its complaint to clarify its trade dress claim.  (Doc. No. 41.)  The Magistrate Judge granted leave to amend, and Plaintiff's Second Amended Complaint was deemed filed on June 20, 2011.  (Doc. No. 42.)  Plaintiff's claims in its Second Amended Complaint were roughly the same as those in its previous complaints, which (once again) did not include a claim for patent infringement.  (Doc. No. 43.)

Shortly thereafter, three days before the disclosure deadline, the parties jointly moved to extend the time for the disclosure of experts.  (Doc. No. 44.)  The Magistrate Judge granted the Motion and ordered Plaintiff to disclose its experts no later than August 1, 2011.  (Doc. No. 45.)  Plaintiff's expert, Dr. Benedict, inspected GPS's products on July 14, 2011.  (Doc. No. 47, p. 2.)  Over two weeks after this inspection, Plaintiff sought leave to amend its complaint to add a claim of patent infringement.  (*Id.*)

Plaintiff disclosed the expert report of Dr. Charles Benedict on August 1, 2011.  (Doc. No. 81, p. 2.)  The very first sentence of Dr. Benedict's report, which consisted of less than a page of analysis, states that the report contained his "preliminary opinion."  (Doc. No. 81-1.)  On August 15, Plaintiff moved to compel a second inspection of Defendants' products based on Defendants' alleged misconduct during the inspection in July.  (Doc. No.

49.)  Plaintiff withdrew this motion before it was ripe for adjudication.  (Doc. No. 53.)

The Magistrate Judge granted Plaintiff leave to amend its complaint on August 19, 2011.  (Doc. No. 51.)  The Third Amended Complaint was entered on the docket that same day.  (Doc. No. 52.)  In it, Plaintiff brought a claim for fraud in Count I, a claim of trade dress infringement in Count II, claims of tortious interference in Count III and Count IV, a breach of contract claim in Count V, a claim for injunctive relief in Count VI, and a claim of patent infringement in Count VII.  (*See id.*)

Thereafter, and in view of the substantial new claims asserted by Plaintiff at the end of the discovery period, Defendants moved to extend discovery in this case and continue the trial.  (Doc. No. 54.)  The Court set a hearing on the motion and, *sua sponte*, asked the parties for briefing on the issue of this Court's jurisdiction over Plaintiff's patent infringement claim.  (Doc. No. 60.)  In response to the Court's request, Defendants notified the Court that the patent asserted by Plaintiff, U.S. Patent No. 6,164,476, was surrendered to the patent office pursuant to Title 35 U.S.C. § 251 and reissued as U.S. Patent No. RE39,444.  (Doc. No. 63, pp. 10-14.)  Plaintiff "chose[] not to address Defendants' arguments" (Doc. No. 64, p. 5) and, "[a]fter reconsideration of its trial strategy and in an effort to simplify the case," requested leave to file a fourth amended complaint which omitted the claim for patent infringement (Doc. No. 65, p. 2).  The Court held a hearing on September 27, 2011, in which it denied Defendants' motion to extend the discovery period, granted leave to Defendants to take the deposition of Dr. Benedict outside of the discovery period, denied Plaintiff's motion for leave to file an amended complaint, and directed Defendants to file a motion for summary judgment on Plaintiff's patent infringement claim.  (*See* Doc. Nos. 70, 72.)  The parties subsequently filed cross motions for summary judgment as well as the

responses, replies, notices and motions listed above.  These issues are now ripe for adjudication.

## II.  The Parties' Evidentiary Motions

Before the Court can delve into the merits of the cross Motions for Summary Judgment in this case, it must first decide two motions which raise evidentiary matters.  The Court will consider Defendants' Motion in Limine to Exclude Expert Testimony of Charles Benedict first. (Doc. No. 81.)  The Court will then consider Plaintiff's Motion to Strike Defendants' Summary Final Judgment Evidence (Doc. No. 94).

### A.     Defendants' Motion in Limine

Defendants move to exclude the testimony of Dr. Charles Benedict, who is Plaintiff's expert. (Doc. No. 81.)  Defendants contend that Dr. Benedict's Second Report should be excluded because it, and the opinions contained therein, were not timely disclosed and because Defendants have been prejudiced by its disclosure on the last day of discovery, which was two months after the deadlines set by the Court.  (*Id.*)

Plaintiff argues in response that Defendants agreed to the untimely service of a Second Report from Dr. Benedict.  (Doc. No. 93, pp. 9-10.)  Plaintiff also argues that Defendants had hired an individual who had inspected Plaintiff's products and, therefore, it "was Plaintiff's understanding that a rebuttal opinion to that of Dr. Benedict would be served after Dr. Benedict's final report."  (*Id.*)

Upon consideration, and after reviewing the entire discovery record in this case, the Court finds that Plaintiff's disclosures of Dr. Benedict's opinions failed to comply with the Federal Rules of Civil Procedure and failed to comply with the orders of this Court. "Because the expert witness discovery rules are designed to allow both sides in a case to

prepare their cases adequately and to prevent surprise, . . . compliance with the requirements of Rule 26 is not merely aspirational." *Cooper v. Southern Co.*, 390 F.3d 695, 728 (11th Cir. 2004) (internal citation omitted), *overruled on other grounds*, *Ash v. Tyson Foods, Inc.*, 546 U.S. 454 (2006).   To this end, Federal Rule of Civil Procedure 37(c)(1) provides:

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:
>
> (A)   may order payment of the reasonable expenses, including attorney's fees, caused by the failure;
> (B)   may inform the jury of the party's failure; and
> (C)   may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi).

The disclosure of the opinions of expert witnesses is mandated by Federal Rule of Civil Procedure 26(a).  Under Rule 26:

> Each witness must provide a written report containing a complete statement of all opinions to be expressed and the basis and reasons therefor, as well as information about the data considered, the witness' qualifications, the compensation earned, and any other recent cases in which he or she offered testimony.  Any party that without substantial justification fails to disclose this information is not permitted to use the witness as evidence at trial unless such failure is harmless.

*Prieto v. Malgor*, 361 F.3d 1313, 1317-18 (11th Cir. 2004) (citation and quotation marks omitted). The Rule requires that disclosures must be made "at the times and in the sequence that the court orders." Fed. R. Civ. P. 26(a)(2)(D).

In this case, the Court permitted counsel wide latitude to expand the time allowed to disclose expert reports.  The Court extended the discovery deadline several times to accommodate the needs of the parties.  Nevertheless, Plaintiff failed to timely and faithfully

comply with these extended deadlines.

The First Report of Dr. Benedict, which was disclosed by Plaintiff on the deadline set by the Court, states it is a "preliminary opinion." (Doc. No. 81-1 (hereinafter "First Report").) This report can be fairly characterized as presenting only Dr. Benedict's opinions regarding patent infringement. (*Id.* at 3.) The entire substance of the "analysis" takes up less than a page of text. (*Id.*) It provides no meaningful analysis of the patent's claims, and no meaningful analysis of how and why Defendants' products infringe those claims. (*Id.*) The Report also does not contain a single reference to Plaintiff's trade dress claims, and provides no meaningful analysis of such claims.[2] (*Id.*)

On the very last day of discovery, and one business day prior to Dr. Benedict's deposition, Plaintiff served Dr. Benedict's Second Report. (Doc. No. 81-4 (hereinafter "Second Report").) The Second Report is in no way a "supplement" of the first. It contains no opinions regarding the infringement of Plaintiff's patent; no discussion of claim construction; no comparison of the alleged infringing devices to the claims of the patent; and no opinions regarding infringement under the doctrine of equivalents. (*Id.*) Instead, it contains nine pages of Dr. Benedict's opinions as to Defendants' infringement of Plaintiff's trade dress. (*Id.*) Plaintiff does not seriously contest the fact that these opinions were not disclosed previously. Indeed, Plaintiff relies upon the fact that Dr. Benedict's opinions were not disclosed in his First Report. (*See* Doc. No. 93, p. 8 "Dr. Benedict is not offering an opinion limited to similarity.")

---

[2]  Plaintiff's argument that the reference to the "similarities" of the parties' products in Dr. Benedict's First Report discloses such opinions is without merit. That statement does not place Defendants on notice of Dr. Benedict's opinions with regard to Plaintiff's trade dress claims and, even if it is construed to do so, is completely conclusory.

Rule 26 requires that an expert's written report contain specific information – such as the expert's compensation for study and testimony, a list of all publications the expert authored in the preceding ten years, and a list of all cases in which the expert testified at trial or by deposition in the preceding four years.  Fed. R. Civ. P. 26(a)(2)(B).  All of this information is wholly absent from both of Dr. Benedict's reports.  Rule 26 also requires the written report to contain "a complete statement of all opinions the witness will express and the basis and reasons for them" and "any exhibits that will be used to summarize or support them."  *Id.*  The "preliminary analysis" presented in Dr. Benedict's First Report does not comply with these requirements.  *See OFS Fitel, LLC v. Epstein, Becker and Green, P.C.*, 549 F.3d 1344, 1363 (11th Cir. 2008) (expert's affidavit which provided "no meaningful analysis of how and why [the defendant's] actions breached the standard of care [as the expert opined]" did not satisfy Rule 26); *Romero v. Drummond Co., Inc.*, 552 F.3d 1303, 1323-24 (11th Cir. 2004) (concluding the trial court did not abuse its discretion when it excluded expert reports which failed to comply with the requirements of Rule 26(a)(2(B)).

Dr. Benedict's Second Report was not timely disclosed.  Rule 26(e)(2) states, "Any additions or changes to [the disclosure report] must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due."  Rule 26(a)(3)(B) provides default deadlines that apply "[u]nless the court orders otherwise."  The Court ordered otherwise; it provided an extended deadline of August 1, at which time Plaintiff was required to disclose all of the opinions of its experts and <u>any and all</u> supplements to such opinions. *See, e.g.*, *Romero*, 552 F.3d at 1323-24.  Rule 26 does not permit litigants unfettered freedom to rely on supplemental disclosures after a court-imposed deadline.  *See Reid v. Lockheed Martin Aero. Co.*, 205 F.R.D. 655, 662 (N.D. Ga. 2001).  Rather, Rule 26

11

imposes a duty on parties to comply with the disclosure deadlines. *Id.* "[I]t grants them no right to produce information in a belated fashion." *Id.* (emphasis in original).

Accordingly, Plaintiff cannot call Dr. Benedict as a witness or rely on his opinions unless Plaintiff's failures were "substantially justified" or harmless. Fed. R. Civ. P. 37(c)(1). It is Plaintiff's burden to show either its failures were substantially justified or harmless. *Roberts ex rel. Johnson v. Galen, Inc.*, 325 F.3d 776, 782 (6th Cir. 2003) (citing cases from the First, Fifth and Seventh Circuit Courts of Appeal); *Southern States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 597 (4th Cir. 2003) (citing a First Circuit case); *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1107 (9th Cir. 2001); *accord Mitchell v. Ford Motor Co.*, No. 08-10302, 2009 WL 593897, at *3 (11th Cir. Mar. 9, 2009) (citing *Leathers v. Pfizer*, 233 F.R.D. 687, 697 (N.D. Ga. 2006)).

In determining whether the failure to sufficiently disclose an expert witness is substantially justified or harmless, courts are guided by, *inter alia*, the following factors: "(1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence." *U.S. ex rel. Bane v. Breathe Easy Pulmonary Servs., Inc.*, No. 8:06-cv-40-T-33MAP, 2009 WL 92826, at *3 (M.D. Fla. Jan.14, 2009) (quoting *Two Men & A Truck Int'l Inc. v. Residential & Commercial Transp. Co., LLC*, No. 4:08-cv-67-WS/WCS, 2008 WL 5235115, at *2 (N.D. Fla. Oct. 20, 2008)).

Here, Plaintiff's disclosure of Dr. Benedict's previously undisclosed opinions

regarding trade dress substantially prejudices Defendants.[3]   First, based upon the deficiencies in Dr. Benedict's First Report and his complete failure to address trade dress infringement, Defendants made a strategic decision not to disclose a defense expert witness.   Since Rule 37 is a "self-executing sanction," *see Perez-Santiago v. Volusia County*, No. 6:08-cv-1868-Orl-28KRS, 2009 WL 8523925, at *1 (M.D. Fla. Oct. 30, 2009), Defendants' decision was reasonable, especially in view of the numerous and obvious deficiencies in Dr. Benedict's First Report.   Plaintiff did not present Dr. Benedict's trade dress opinions prior to the disclosure of Dr. Benedict's Second Report.   As a result of this disclosure on the final day of discovery, Defendants were not able to offer their own rebuttal expert prior to the close of discovery.

In addition, Defendants were prejudiced because the late disclosures were made one business day before Dr. Benedict's deposition, which had been set by order of the Court.   Such disclosure, on the eve of the expert's deposition, deprives the opposing party of the time needed to fully comprehend the expert's opinions and satisfactorily prepare an effective cross examination of the expert.

Rule 26 (as well as the staggered expert disclosure deadlines imposed by the Court) was intended to prevent both forms of prejudice.   *See Reese v. Herbert*, 527 F.3d 1253, 1266 (11th Cir. 2008) (noting the expert disclosure requirements of Rule 26 are designed "to provide opposing parties reasonable opportunity to prepare for effective cross examination and perhaps arrange for expert testimony from other witnesses").

The Court also notes that Plaintiff's last minute expert disclosure changes the scope

---

[3]  The Court focuses this part of its analysis on Dr. Benedict's trade dress opinions. There is no need to exclude his testimony regarding Plaintiff's patent claims, as the Court finds that there was no legal basis for such claims.

of Plaintiff's trade dress claims.  Dr. Benedict's trade dress opinions identify elements of Plaintiff's trade dress which were not previously identified by Plaintiff.  This is not a trivial change.  Professor McCarthy highlights in his treatise the need to define the elements that combine to form a particular product configuration.  *See* 1 J. Thomas McCarthy, <u>McCarthy on Trademarks and Unfair Competition</u> § 8:3 (4th ed. 2011).  Careful definition is needed because "[o]nly then can the court and the parties coherently define exactly what the trade dress consists of and determine whether that trade dress is valid and if what the accused is doing is an infringement." *Id.*  In other words, Plaintiff's trade dress claims require early and careful delineation so that such claims can be properly analyzed by the accused infringer and the Court.  The prejudice which flows from Plaintiff's last minute change in the scope of its trade dress claims is plain.

Plaintiff's explanation for failing to disclose Dr. Benedict's trade dress opinions is not persuasive.  The first inspection of GPI's products occurred in July, at least two weeks prior to the already-extended disclosure deadline.  Plaintiff knew at that time that Dr. Benedict would not be able to prepare a complete report.  Yet Plaintiff did not move to extend the expert witness deadlines at that time or anytime thereafter.

At a hearing in this matter on September 27, 2011, the parties and the Court discussed Dr. Benedict's deposition.  Counsel for Defendants informed the Court that they had not received a supplemental report from Plaintiff and did not know if Plaintiff would be disclosing such a report.  (Doc. No. 81-3, at 10:21.)  Plaintiff's counsel did not inform the Court or the opposing counsel at the hearing that Dr. Benedict was preparing a supplemental report.  (*See id.*)  Nor did he avail himself of the opportunity to move for leave to file a supplemental report.  (*See id.*)  Yet only three days after the hearing, Plaintiff

disclosed Dr. Benedict's Second Report in violation of the Federal Rules of Civil Procedure and the prior orders of the Court and without applying to the Court for leave to make such a disclosure.

At the September 27 hearing, the Court reminded counsel that they should to apply to the Court if they encountered problems complying with the discovery deadlines and that such applications were disfavored. (*Id.* at 12:2-9.) The Court reminded counsel that discovery deadlines were not for the parties' convenience. (*Id.*) Discovery deadlines are set by the Court to control its trial calendar and ensure the parties are properly moving a case forward. The Court told counsel that it had reviewed the filings in this case; was troubled by what it saw; and warned "the cavalier assessment or treatment of the Court's scheduling order is not going to be tolerated." (*Id.*) Plaintiff failed to heed the Court's warning.

Moreover, Plaintiff's last minute expert disclosure was not an isolated incident. Throughout this matter, Plaintiff has made  repeated filings and disclosures on significant matters on or just before the deadlines set by the Court. Plaintiff's last minute filings and disclosures have greatly affected the orderly handling of this case, and have caused Defendants unnecessary prejudice. In view of this history, Plaintiff's arguments do not support a finding that its failures were "substantially justified" or harmless.

Therefore, for the reasons stated above, the Court concludes that Defendants' Motion in Limine to Exclude Expert Testimony of Charles Benedict (Doc. No. 81) should be granted.

### B.    Plaintiff's Motion to Strike

15

Plaintiff moves the Court to "strike" certain documents attached as exhibits to and referenced in Defendants' Motion for Summary Judgment because such documents were not properly authenticated.  (Doc. No. 94.)  The Motion is due to be denied for at least four reasons.

First, Plaintiff's counsel failed to comply with Local Rule 3.01(g).  That rule <u>requires</u> the moving party to confer with counsel for the opposing party in a good faith effort to resolve the issues raised by the motion, and include in the motion a statement certifying that moving counsel has conferred with opposing counsel and stating whether counsel agree on the resolution of the motion.  *See* Local Rule 3.01(g).  For this reason alone, Plaintiff's motion is due to be denied.

Second, the Federal Rules of Civil Procedure do not authorize the relief sought in the motion.  As pointed out by Defendants in their opposition paper, the Court's authority to strike is limited to pleadings, not evidence.  (*See* Doc. No. 99, pp. 2-3); *Polite v. Dougherty County Sch. Sys.*, 314 F. App'x 180, 184 n.7 (11th Cir. 2008) (per curiam) ("[M]otions to strike are only appropriately addressed towards matters contained in the pleadings; here, the affidavit was submitted as part of the motion for summary judgment, which is not a pleading.").  The proper method to object to evidence submitted on summary judgment is for "the party opposing the motion to register its objection to the movant's affidavits by way of the material submitted in opposition to the motion." *Smith v. Southeastern Stages, Inc.*, 479 F. Supp. 593, 594 (N.D. Ga. 1977).  This was clearly understood by the drafters of the revised Federal Rule of Civil Procedure 56, which permits a party opposing a motion for summary judgment to object to materials cited in support of a fact on summary judgment in the opposing party's response to the motion.  Fed. R. Civ.

P. 56(c)(2).   The Rule provides further that the Court may consider facts not properly objected to in an opposition as undisputed.  *See* Fed. R. Civ. P. 56(e).  Put simply, a party who opposes a summary judgment motion risks waiving any evidentiary objections it may have when it fails to raise such objections in the proper form and at the proper time.  For this reason alone, Plaintiff's motion is due to be denied.

Third, the Court construes a motion to strike such as that brought by Plaintiff in this case as a procedural device by which a party may try to exceed the page limits imposed by the Local Rules and the orders of the Court.  Indeed, Plaintiff's opposition to Defendants' Motion for Summary Judgment attempts to incorporate by reference the arguments made in Plaintiff's motion to strike.  Such incorporation by reference is improper, and it foists upon the Court the burden of sifting through irrelevant materials to find the materials referenced while permitting the movant to circumvent this Court's page limit requirement.

The Court's page limit requirement is not imposed to burden the parties.  It is intended to focus the parties' attention on the most pressing matters and winnow the issues to be placed before the Court, thereby conserving judicial resources.  Moreover, the page limit requirement works in conjunction with the meet and confer requirement of Local Rule 3.01(g) to encourage parties to resolve issues, such as those raised in Plaintiff's Motion to Strike, that are more appropriately addressed by counsel.  The Court will not countenance any attempt to avoid the page limit requirement of the Local Rules and the previous orders of this Court.  Thus, Plaintiff's motion is due to be denied for this reason alone.

Lastly, Plaintiff's Motion to Strike is due to be denied because the issues raised therein are without merit or, in the case of Buck's notarized statement, frivolous.

### III.  The Cross Motions for Summary Judgment

The Court will address the cross motions for summary judgment as they relate to each claim in Plaintiff's Third Amended Complaint.

## A.     Count I:  Common Law Fraud

In Count I, Plaintiff alleges that Buck defrauded them by refusing to sign a agreement settling a prior lawsuit brought against Buck's former employer.  There is no dispute that Buck is not a signatory to that settlement agreement.  Plaintiff contends it was fraudulently induced to enter into the settlement agreement by assurance from Buck that he would not market or manufacture products that were similar to those sold by Plaintiff.

Defendants argue that Plaintiff cannot advance any evidence that Buck fraudulently induced Plaintiff to enter into the settlement agreement without Buck's signature.  (Doc. No. 83, pp. 8-9.)  Plaintiff points to a few emails and a notarized statement from Buck, and contends these demonstrate that Plaintiff was fraudulently induced to settle without Buck's signature.  (Doc. No. 95, pp. 6-7.)  These documents do not, however, raise a genuine dispute of a material fact.

To establish its fraud claim, Plaintiff must show that Buck (1) made a statement concerning a material fact; (2) knowing that the statement was false; (3) with intent that Plaintiff would act on the false statement; and (4) Plaintiff was damaged as a result of its reasonable reliance on the false statement.   *See Lopez-Infante v. Union Cent. Life Ins. Co.*, 809 So. 2d 13, 15 (Fla. 3d DCA 2002); *Gutter v. Wunker*, 631 So. 2d 1117, 1118 (Fla. 4th DCA 1994); *Johnson v. Davis*, 449 So. 2d 344, 348 (Fla. 3d DCA 1984).

Generally, the fraudulent statement must concern a past or existing fact.  *See Mejia v. Jurich*, 781 So. 2d 1175, 1177 (Fla. 3d DCA 2001).  The statement on which Plaintiff bases this claim does not concern a past or existing fact; it concerns Buck's intention to do

something (or, rather, refrain from doing something) in the future.  As such, Plaintiff must advance credible evidence that Buck made his promise with no intention of performing or with a positive intention not to perform.  *See id.*  Plaintiff has not done so.  Instead, the undisputed evidence shows that Buck did not participate in the "military market" following the settlement.

Additionally, the Court concludes that the notarized statement relied upon by Plaintiff cannot be fairly characterized as a promise by Buck to stay out of the "military market" for metal storage systems.  Plaintiff's entire claim seems to rest on a small portion of the statement, a single phrase in a single sentence.  When that phrase is read in context, however, it is clear that the larger message was that Buck disagreed with his employer and did not want to be bound by the terms of the settlement agreement. That is not a promise not to participate in the military market in the future.

Lastly, since the undisputed evidence of record demonstrates that no contract was awarded by DLA in connection with the 2010 solicitation, Plaintiff cannot show that it has been damaged as a result of its reasonable reliance on Buck's allegedly false statement. It is a well-settled in Florida that there must be actual damages to recover in a fraud action. Fraud which does not result in damage is not actionable.  *See Casey v. Welch*, 50 So. 2d 124 (Fla. 1951); *Stokes v. Victory Land Co.*, 128 So. 408 (Fla. 1930); *Pryor v. Oak Ridge Dev. Corp.*, 119 So. 326 (Fla. 1928); *Wheeler v. Baars*, 15 So. 584 (Fla. 1894); *Nat'l Aircraft Sers., Inc. v. Aeroserv Int'l, Inc.*, 544 So. 2d 1063 (Fla. 3d DCA 1989); *Nat'l Equip. Rental, Ltd. v. Little Italy Rest. & Delicatessen, Inc.*, 362 So. 2d 338 (Fla. 4th DCA 1978).

For these reasons, summary judgment is due to be granted in favor of Defendants on Count I of Plaintiff's Third Amended Complaint.

### B.    Count II: Trade Dress Infringement

Plaintiff contends that a number of Defendants' products infringe on Plaintiff's particular trade dress for its metal shipping and storage containers in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).  In Count II of its Third Amended Complaint, Plaintiff contends that Defendants have "incorporated the following nonfunctional features" of its own products: (1) the mesh design of the frame; (2) the galvanized steel component of the frame; (3) the front panels of the frame, including the manner in which the panels go on the frame and the manner in which they lock; (4) the pockets of the frame; (5) the dimensions of the frame; (6) the design of the shelves, including the manner in which the shelves lock in place to prevent movement and require no tools or attachments to install or move; and (7) the overall product design and image which make the product more functional.  (Doc. No. 52, ¶ 37.)

Defendants first move for summary judgment because each of the elements identified by Plaintiff are functional and, therefore, cannot serve as a product's trade dress. (Doc. No. 83, pp. 13-19.)  Defendants also argue that Plaintiff has failed to show that its trade dress has acquired secondary meaning.  (*Id.* at 20-23.)  Lastly, Defendants contend that Plaintiff cannot demonstrate confusion where, as is the case here, the customer's purchasing decisions are based solely on functionality, not brand or product aesthetics. (*Id.* at 23-25.)

Plaintiff argues, in response, that its product features are non-functional and, therefore, protected.  (Doc. No. 95, pp. 10-13.)  It also argues that its products are established in the military market and have acquired secondary meaning in that market. (*Id.* at 13-16.)  Plaintiff argues that there is evidence of confusion in this case and that the

statements of the government procurement officers do not matter.  (*Id.* at 16-19.)

To establish a claim of trade dress infringement, Plaintiff must prove three elements. *Bauer Lamp Co. v. Shaffer*, 941 F.2d 1165, 1170 (11th Cir. 1991).  "First, the plaintiff must show that the product is distinctive or has developed a secondary meaning; second, that the features in question are nonfunctional and third, that the resemblance between the two products is confusingly similar."  *Id.*  The Court is mindful that "the trade dress of a product . . . consists not of the entire product but only of those nonfunctional features of the product that, taken together, make up its total image."  *Ashley Furniture Indus., Inc. v. SanGiacomo N.A. Ltd.*, 187 F.3d 363 (4th Cir. 1999) (citing *Stuart Hall Co. v. Ampad Corp.*, 51 F.3d 780, 788 (8th Cir.1995)).  The court will briefly address the scope of protection sought by Plaintiff before turning to functionality.

### 1.    Scope of Protection for the Trade Dress of a Family of Products

Both parties treat this as a "plain vanilla" trade dress claim.  Plaintiff is not seeking to protect a single product configuration, however.  It is attempting to assert trade dress protection for a family of related products.  The Eleventh Circuit has not, so far as the Court can ascertain, addressed what additional requirements a proponent of the trade dress of a family of products must satisfy to state a claim.  Other circuit courts have held that a "trade dress plaintiff seeking to protect a series or line of products faces a particularly difficult challenge, as it must show that the appearance of the several products is 'sufficiently distinct and unique to merit protection.'"  *Yankee Candle Co. v. Bridgewater Candle Co.*, 259 F.3d 25, 42 (1st Cir. 2001).  This is so because "trade dress claims across a line of products present special concerns in their ability to artificially limit competition, as such claims are generally broader in scope than claims relating to an individual item."  *Id.*

21

In these circumstances, the Third Circuit requires the proponent of a trade dress claim to show, at the outset, that its products have a "consistent look."  *See Rose Art Indus., Inc. v. Swanson*, 235 F.3d 165, 172-73 (3rd Cir. 2000).   In *Rose Art*, the Third Circuit held that a "plaintiff, seeking protection for a series or line of products, must first demonstrate that the series or line has a recognizable and consistent overall look."  *Id.* at 173.  "Only after the plaintiff has established the existence of recognizable trade dress for the line or series of products should the trial court determine whether the trade dress is distinctive, whether the trade dress is nonfunctional, and whether the defendant's use of plaintiff's trade dress is likely to cause consumer confusion."  *Id.*  "[I]n seeking protection for the trade dress of a line of products, the plaintiff can define the line as it sees fit."  *Id.* It "can group together any number of products in any way it sees fit, as long as the products have a consistent overall look."  *Id.*

In this case, Plaintiff has failed to articulate what consistent overall look is present in its family of products.  Some products appear to have some of the elements; other products appear to lack some of those elements.[4]  It is incumbent upon the proponent of a trade dress to define the elements of its trade dress.  If the proponent does not precisely define its trade dress, the analysis that follows necessarily devolves into an abstract exercise of questioning unprotectable qualities such as beauty or cachet.  *See, e.g.*, *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 116-17 (2d Cir. 2001); *see also Rose Art Indus.*, 235 F.3d at 173 ("[I]f a plaintiff seeking trade dress protection cannot show that its packages have a 'consistent overall look,' the trade dress that the defendant is allegedly

---

[4]  This is in addition to Plaintiff's attempts to change the "elements" of its trade dress in the Second Report of Dr. Benedict.

infringing 'does not exist,' and the defendant must prevail." (internal quotations omitted)).

Upon consideration, the Court concludes that Plaintiff has not articulated and then shown that its products possess distinctive characteristics which give them a consistent overall look.  The trade dress in this case is very similar to *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373 (2d Cir. 1997).  In *Landscape Forms*, the plaintiff could not explain exactly which aspects of its product design merit protection.  *Id.* at 381.  Likewise, in this case, Plaintiff has not articulated to the Court the distinctive features of its products.  It did not do so when it applied for a temporary restraining order.  (*See* Doc. No. 27-1, at 15:24 to 16:1 ("It is not even clear to the Court what features are alleged to be trade dress as opposed to what features are the functional features of the product.").)  It did not do so in its Third Amended Complaint.  The allegations in the complaint suggest only that Defendants' products incorporate <u>some</u> of the distinctive features of Plaintiff's trade dress.  (*See* Doc. No. 52, ¶ 37.)  The disclosure of <u>some</u> features is not enough to satisfy an analysis which requires the Court to look at an asserted trade dress as a whole.  Plaintiff also made no attempt to articulate all of the elements of its trade dress in response to Defendants' motion for summary judgment.  (*See* Doc. No. 95, pp. 10-19.)  The Court concludes that Plaintiff is required to show its products possess a "consistent overall look" and that it has failed to do so.

Further, the Court agrees with the Second Circuit's statement that "a plaintiff's inability to explain to a court exactly which aspects of its product(s) design merit protection may indicate that its claim is pitched at an improper level or generality, i.e., the claimant seeks protection for an unprotectable style, theme or idea."  *Id.*  A plaintiff who cannot articulate what its trade dress is has failed to raise a genuine dispute sufficient to ward off

summary judgment. The Court (must less the accused infringer) cannot evaluate the total commercial impression of a product if Plaintiff does not precisely define its trade dress.

For these reasons alone, the Court finds that summary judgment is due to be granted on Plaintiff's claim of trade dress infringement.

## 2. Non-Functional Trade Dress Features

Even assuming the features found in paragraph 37 of Plaintiff's Third Amended Complaint are a complete articulation of Plaintiff's trade dress – an assumption that this Court does not make because Plaintiff has never affirmatively asserted on the record a complete list of those features – the Court concludes that those features are common, everyday design characteristics which do not qualify for trade dress protection. See *Miracle Blade, LLC. v. Ebrands Commerce Group, LLC*, 207 F. Supp. 2d 1136 (D. Nev. 2002) (denying preliminary injunction against competing infomercial on the basis of copyright and trade dress infringement because "plaintiff's trade dress is a combination and refinement of commonly used elements of other prior direct-marketed knife sets" and because "plaintiff has failed to demonstrate how its trade dress is unique from other direct marketers of knives and how it serves to identify the products to a specific source."); *Regal Jewelry Co. v. Kingsbridge Int'l, Inc.*, 999 F. Supp. 477 (S.D.N.Y. 1998) (finding no trade dress in color and style of packaging for novelty items where "the features used on [plaintiff's] boxes are common, inexpensive design features which appear in similar combinations on many novelty item boxes."). The Court reaches this decision when it considers the features individually and when it considers the overall impression created by the features collectively.

Each of the six characteristics[5] identified in Plaintiff's Third Amended Complaint serve a utilitarian purpose in Plaintiff's products.  The wire mesh securely holds items in the storage containers while simultaneously allowing government employees to inspect the contents of the container.  This is not unlike transparent plastic packaging used to wrap consumer goods.  *See* 1 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 7:87 (4th ed. 2011) ("The use of ordinary packaging such as transparent cellophane is functional and free for all to use.").  It is a well-known and commonly understood fact that steel is galvanized to resist corrosion.  This method of protecting steel is cheap, effective, and so widely-used in metal fabrication that it strains credulity to suggest that the galvanized steel frames of Plaintiff's products are anything but functional.  The panels are nothing more than a rectangular frame with wire mesh.   They are simple.  Their shape and components are driven by the use of Plaintiff's products – which requires separate containers to be stacked and assembled in a rectangular shape so that the combined unit completely fills a common shipping container or fits within a military vehicle.  The manner in which the panels attach to the frame is likewise simple and utilitarian.  It does not serve a source-identifying function.  The dimensions of the frame are driven by the requirements of the military, such requirements being set forth precisely in the

---

[5]   These include: (1) the mesh design of the frame; (2) the galvanized steel component of the frame; (3) the front panels of the frame, including the manner in which the panels go on the frame and the manner in which they lock; (4) the pockets of the frame; (5) the dimensions of the frame; and (6) the design of the shelves, including the manner in which the shelves lock in place to prevent movement and require no tools or attachments to install or move.  The Court omits the seventh characteristic, which was identified by Plaintiff as "the overall product design and image which make the product more functional." The trade dress analysis necessarily turns on the totality of the trade dress and, as such, this "characteristic" is gratuitous.  Further, in view of the requirement that Plaintiff's trade dress be non-functional, Plaintiff's assertion that the overall product design "make[s] the product more functional" is, quite frankly, bizarre.

solicitations, and (as discussed above) the need for these products to stack and completely fill a shipping container.  The seventh "characteristic" – a shelf that "locks into place to prevent movement and require no tools or attachments to install or move" – is defined in functional terms and, *a priori*, is functional.  Plaintiff offers no competent evidence that any of these  "characteristics" serve a source-identifying function, or that the sum of these parts combine to become source-identifying.

As explained in many of the seminal cases in this area, a product feature is functional when it is essential to the use or purpose of the device or when it affects the cost or quality of the device.  *See TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23, 32-33 (2001); *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 165 (1995); *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 850 n.10 (1982).  All of the features identified by Plaintiff in its Third Amended Complaint are essential to the use of Plaintiff's products by the U.S. military or, if replaced by alternatives, would affect the cost or quality of the goods.[6]   Plaintiff has failed to raise a genuine dispute regarding the functionality of its product design.

*     *     *     *     *

For each of the reasons discussed above, summary judgment is due to be granted in favor of Defendants on Count II of Plaintiff's Third Amended Complaint.

### C.        Count III and Count IV: Tortious Interference

The Court notes that the claims brought in Count III and Count IV are both treated

---

[6]  The risk of increasing competitors' costs is particularly acute in this case because the terms of the solicitation make clear the cost of the products is the primary (although not the only) concern of the government procurement officials.

under Florida law under the rubric of tortious interference of a business relationship. Both claims seek damages based on the same alleged conduct, which allegedly interfered with Plaintiff's "relationship" with the U.S. military. As such, the Court will analyze the claims brought in both Counts together.

To prove tortious interference, Plaintiff must show: (1) the existence of a contract or business relationship not necessarily evidenced by an enforceable contract under which the it has rights; (2) defendants' knowledge of the relationship; (3) an intentional and unjustified interference with the relationship by defendants; and (4) damage as a result of the interference. *See Salit v. Ruden, McClosky, Smith, Schuster & Russell, P.A.*, 742 So. 2d 381, 385 (Fla. 4th DCA 1999). A business relationship is evidenced by "an actual and identifiable understanding or agreement which in all probability would have been completed if the defendant had not interfered." *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 815 (Fla. 1994).

Defendants contend that Plaintiff cannot show an existing business relationship with the U.S. military, and cannot show that Defendants intentionally and unjustifiably interfered with Plaintiff's relationship with the U.S. military. (Doc. No. 83, pp. 9-12.) Plaintiff, in response, points to the 2010 solicitation as evidence of its "relationship" with the U.S. military and some testimony that Plaintiff had, in the past, sold goods to the U.S. military. (Doc. No. 95, pp. 7-8.) First, Plaintiff's understanding of the 2010 solicitation is not consistent with the applicable regulations or a plain reading of the terms of the solicitation. Under the applicable regulations, a solicitation is "any request to submit offers or quotations to the Government." 48 C.F.R. § 2.101. The regulations state further that solicitations which require the use of sealed bids are called "requests for bids"; those contemplating

27

additional negotiation are called "requests for proposals"; and those using "simplified acquisition procedures" may simply require submission to the government either a quotation or an offer.  *Id.*  An offer is "a response to a solicitation that, <u>if accepted</u>, would bind the offeror. *Id.* (emphasis added).  As these basic definitions make clear, a solicitation is not a contract.  It is the prelude; a request for offers from all interested parties; an advertisement of the needs of the U.S. government.  The solicitation is a request for offers, nothing more.  It is not evidence a contract or "relationship" between Plaintiff and the U.S. military.

Since there was no existing contract, Plaintiff must advance some evidence that, in all probability, the U.S. military would have entered into a contract with Plaintiff but for Defendants' protest.  *See St. Johns River Water Mgmt. Dist. v. Fernberg Geological Servs., Inc.*, 784 So. 2d 500, 505 (Fla. 5th DCA 2001); *see also ISS Cleaning Servs. Grp., Inc. v. Cosby*, 745 So. 2d 460, 462 (Fla. 4th DCA 1999) (reversing denial of directed verdict where there was not competent substantial evidence of an agreement "which in all probability would have been completed had the alleged interference not occurred.").  Given that the solicitation itself encourages parties other than Plaintiff to submit offers in response, it cannot serve this purpose.  Further, since Defendants' protest was submitted to DLA in accordance with the terms of the solicitation and the applicable regulations, such action was not "an intentional and unjustified interference" under Florida law.

The additional testimony advanced by Plaintiff likewise does not show the existence of a business relationship.  Rather, such testimony evinces only the fact that Plaintiff had, in the past, sold goods to the U.S. military.  Such testimony does not demonstrate an agreement to purchase goods in the future, especially in view of the comprehensive

28

procurement regulations which govern such purchases.

Accordingly, summary judgment is due to be granted in favor of Defendants on Plaintiff's claims for tortious interference.

### D.     Count V: Breach of Contract

In Count V, Plaintiff brings a breach of contract claim against Buck.  Plaintiff contends that Buck is bound by a settlement agreement that it entered into with a different company, ITN/Grate Pallet Inc. ("ITN"), in 2004.  That agreement prohibits ITN and its principals from manufacturing and selling certain goods for fifteen years from the date of the agreement.  According to the allegations in Plaintiff's Third Amended Complaint, Buck was a "shareholder/principle" of ITN and, therefore, bound by the terms of the settlement agreement.  Plaintiff also alleged that Buck is acting as an agent of his father, who signed the settlement agreement as an officer of ITN.

Defendants argue that the settlement agreement is not enforceable against Buck because he did not sign the agreement.  (Doc. No. 83, pp. 6-8.)  Furthermore, Buck was not a party to the lawsuit that the agreement purported to settle, nor is there any evidence that he is acting as an agent of his father.  (*Id.*)  Defendants contend that James Buck "has no role in GPS as a manager, owner, investor, advisor or otherwise."  (*Id.* at 8.)

The Court concludes that Plaintiff has failed to raise a genuine dispute regarding a material fact as to this claim.  Plaintiff does not attempt to refute Defendants' contention that Buck was not a signatory to the agreement.  (*See* Doc. No. 95, pp. 3-5.)  Therefore, this fact is deemed admitted.  Fed. R. Civ. P. 56(e) ("If a party fails to properly . . . address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for the purposes of the motion.").

Plaintiff argues instead that Buck retained "his managing role" in ITN after resigning from that company's board and, therefore, should be bound by the settlement agreement. (Doc. No. 95, pp. 3-5.)  The testimony that Plaintiff points to in order to show that Buck retained "his managing role" in ITN, however, cannot be fairly characterized as supporting that contention.  Buck testified – consistent with his notarized statement – that he resigned as an officer of ITN but remained employed as a "production manager."  (Doc. No. 86-1, September 8, 2011 Deposition of Thomas R. Buck (hereinafter "Buck Dep."), at 54:14-24.)  As production manager, Buck "oversaw the production of orders that [ITN] actually had to build, or paint, or process, however you want to look at it."  (*Id.* 24:16-21.)  He was not making business decisions, i.e., acting in a "managing role," at ITN.  (*Id.* 77:18 to 79:18.)

Florida law permits some anti-competitive agreements; but, Florida courts "enforce anti-competitive agreements only where the statutes specifically so authorize."  *Marx v. Clear Channel Broad., Inc.*, 887 So. 2d 405, 407-08 (Fla. 4th DCA 2004).  Section 542.335 of the Florida Statutes proscribes the boundaries of valid anti-competitive agreements. That statute prohibits courts from enforcing an anti-competitive agreement "unless it is set forth in a writing signed by the person against whom enforcement is sought."  Fla. Stat. § 542.335(1)(a).  Plaintiff's attempt to circumvent this requirement of Florida law is not well taken.

Seemingly conceding that Buck is not a party to the settlement agreement, Plaintiff argues that non-signatories have been bound by anti-competitive agreements by Florida's courts.  (Doc. No. 95, p. 5-6 n.2.)  Plaintiff cites to *Dad's Props., Inc. v. Lucas*, 545 So.2d 926 (Fla. 2d DCA 1989), in support.  *Dad's Properties*, however, does not stand for the proposition advanced by Plaintiff.

30

In that case, there was a valid, enforceable and signed agreement to sell an adult nightclub. *See id.* at 928. The seller was a corporation jointly owned by a husband and wife, who were also its only directors and officers. *Id.* The agreement was signed only by the husband, however, in his individual and corporate capacities. *See id.* The wife thereafter incorporated a competing business and employed her husband as its manager in violation of a provision in the purchase agreement prohibiting the seller from engaging in the "live adult entertainment business, either directly or indirectly," for five years. *Id.*

The Court did not hold that the wife was "bound by" the purchase agreement, as Plaintiff contends. Rather, the Court in *Dad's Properties* enjoined the wife and her corporation from "aiding and abetting" her husband from violating the agreement. *Id.* In other words, the Florida court used its equitable powers to prevent non-signatories to an anti-competitive agreement from facilitating its breach by someone who is "bound by" that agreement. *See id.*

There is no competent evidence in this case that a signatory to the settlement agreement is engaging in a similar evasion. Plaintiff has not advanced any evidence that shows that a signatory to the settlement agreement is violating its terms. Thus, Plaintiff has failed to show that Defendants are "aiding and abetting" anyone who was a party to the settlement agreement.

In view of the above, summary judgment is due to be granted in favor of Defendants on Plaintiff's claims for breach of contract.

### E.   Count VII:[7] Patent Infringement

---

[7] Count VI of Plaintiff's Third Amended Complaint seeks injunctive relief. In Florida, there is no separate cause of action for injunctive relief. It is a remedy, not an independent cause of action.

Throughout this lawsuit, Plaintiff has insisted it intended to bring claims of patent infringement against Defendants for their manufacture of certain shipping and storage systems. When Plaintiff finally got around to bringing such claims as Count VII of their Third Amended Complaint, almost ten months after the initiation of this lawsuit and a month before the close of discovery, Plaintiff alleged Defendants infringed U.S. Patent No. 6,164,476. Many years before this lawsuit began, however, this patent had been voluntarily surrendered to the U.S. Patent and Trademark Office (the "Patent Office") by its inventors during a subsequent reissue proceeding.[8]

It is black letter law that an original patent is void and unenforceable after the patent is surrendered to the Patent Office in a reissue proceeding. *See Eby v. King*, 158 U.S. 366 (1895); *Reedy v. Scott*, 90 U.S. 352 (1874); *Moffitt v. Garr*, 66 U.S. 273 (1861); *Seattle Box Co., Inc. v. Indus. Crating & Packing, Inc.*, 731 F.2d 818 (Fed. Cir. 1984); *Franklin & Co. v. Illinois Moulding Co.*, 128 F. 48 (C.C.N.D. Ill. N. Div.1904); *Pfizer Inc. v. Apotex Inc.*, 731 F. Supp. 2d 741 (N.D. Ill. 2010); *Voter Verified, Inc. v. Premier Election Solutions, Inc.*, No. 6:09-cv-1968-Orl-19KRS, 2010 WL 2136494 (M.D. Fla. May 27, 2010). Thus, there is no legal basis for Plaintiff's claims of patent infringement. Summary judgment is due to be granted in favor of Defendants on all such claims.

*   *   *   *   *

In sum, Defendants' motions for summary judgment are well taken, and summary

---

[8] The parties have also briefed the issue of standing to bring the patent infringement claim. Upon review of those papers, the Court concludes there are material issues of fact concerning the ownership and licensing of the patents. Such issues of fact would require an evidentiary hearing to resolve. Since there was never a legal basis for Plaintiff's patent infringement claim, the Court concludes it would serve no purpose to hold such a hearing.

judgment is due to be granted in favor of Defendants on all of Plaintiff's claims.

## IV.  CONCLUSION

In view of the foregoing, the Court hereby **ORDERS** as follows.

1.    Defendants' Motion for Partial Summary Final Judgment on Plaintiff's Patent Infringement Claim (Doc. No. 74) is **GRANTED**.

2.    Defendants' Motion in Limine to Exclude Expert Testimony of Charles Benedict (Doc. No. 81) is **GRANTED**.

3.    Plaintiff's Motion for Partial Summary Judgment (Doc. No. 82) is **DENIED AS MOOT**.

4.    Defendants' Motion for Summary Final Judgment (Doc. No. 83) is **GRANTED**.

5.    Plaintiff's Motion to Strike Defendants' Summary Final Judgment Evidence (Doc. No. 94) is **DENIED**.

6.    All remaining motions are **DENIED AS MOOT**.  The Court will address the Report and Recommendation at Docket No. 100 in a separate order.

7.    The trial setting and all hearings are cancelled.

8.    The Court awards costs to Defendants.

9.    The Clerk of Court is directed to enter judgment against Plaintiff and in favor of Defendants as follows:

> IT IS ORDERED AND ADJUDGED that Plaintiff, Mobile Shelter Systems USA, Inc., recover nothing; the action be dismissed on the merits; and Defendants, Grate Pallet Solutions, LLC, and Thomas R. Buck, recover costs from the Plaintiff.

10.    The Clerk is also directed to close this file.

**DONE AND ORDERED** in Chambers in Jacksonville, Florida, on January 13, 2012.

ROY B. DALTON JR.
United States District Judge

Copies:

counsel of record